ACCEPTED
12-15-00201-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
9/16/2015 1:28:43 PM
Pam Estes
CLERK

NO. 12-15-00201-CV

_____

IN THE COURT OF APPEALS OF TEXAS
FOR THE TWELFTH CIRCUIT
TYLER, TEXAS

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
9/16/2015 1:28:43 PM
PAM ESTES
Clerk

_____

*Oliver Lane Chambers, Donna Kay Chambers-Jones, Rhonda Thompson, Clinton L. Chambers and wife, Brandi N. Chambers*
Appellants

v.

*San Augustine County Appraisal District*
Appellee

_____

On Appeal From Cause No. CV-13-9481
In the 273RD Judicial District Court of San Augustine County, Texas

---

**APPELLANTS' BRIEF**

---

METTAUER LAW FIRM, PLLC
Attorneys & Counselors at Law
**April Gregston Prince**
**State Bar No. 24047247**
**april@mettauerlaw.com**
**Lead Counsel**
Gavin I. Midgley
State Bar No. 24092832
gavin@mettauerlaw.com
403 Nacogdoches Street, Suite 1
P.O. Box 2016
Center, Texas 75935
(936) 598-9400 (Phone)
(936) 598-6122 (Facsimile)

## Identity of Parties and Counsel

Pursuant to TEX. R. APP. P. 38.1(a), the parties to this suit are as follows:

(1)     **OLIVER LANE CHAMBERS, DONNA KAY CHAMBERS-JONES, RHONDA THOMPSON, CLINTON L. CHAMBERS AND WIFE, BRANDI N. CHAMBERS,** c/o Mettauer Law Firm, PLLC, 403 Nacogdoches Street, Suite 1, Center, Texas 75935, are Appellants and were Plaintiffs in trial court.

(2)     **SAN AUGUSTINE COUNTY APPRAISAL DISTRICT**, c/o Jeff Bates, 118 E. Hospital St., Suite 100, Nacogdoches, Texas 75963, is Appellee and was Defendant in the trial court.

The trial attorneys were as follows:

(1)     Oliver Lane Chambers, Donna Kay Chambers-Jones, Rhonda Thompson, Clinton L. Chambers and wife, Brandi N. Chambers were represented by **APRIL GREGSTON PRINCE,** Mettauer Law Firm, PLLC, 403 Nacogdoches Street, Suite 1, Center, Texas 75935.

(2)     San Augustine County Appraisal District was represented by **JEFF BATES**, 118 E. Hospital St., Suite 100, Nacogdoches, Texas 75963.

The appellate attorneys are as follows:

(1)     Oliver Lane Chambers, Donna Kay Chambers-Jones, Rhonda Thompson, Clinton L. Chambers and wife, Brandi N. Chambers are represented on

appeal by **APRIL GREGSTON PRINCE,** Mettauer Law Firm, PLLC, 403 Nacogdoches Street, Suite 1, Center, Texas 75935.

(2) San Augustine County Appraisal District is represented on appeal by **JEFF BATES**, 118 E. Hospital St., Suite 100, Nacogdoches, Texas 75963.

# Table of Contents

Page

Identity of  Parties and Counsel . . . . . . . ii

Table of Contents . . . . . . . . . iv

Table of Authorities . . . . . . . . vi

Statement on Oral Argument . . . . . . . vii

References to the Record . . . . . . . . vii

Statement of the Case . . . . . . . . 1

    I.     Nature of the Case . . . . . . . 1

    II.    Course of Proceedings . . . . . . 1

Issue Presented . . . . . . . . . 4

Statement of Facts . . . . . . . . . 4

Summary of the Argument . . . . . . . 7

Argument . . . . . . . . . . 7

    The Trial Court Erred in Granting Appellee's Motion for
    Summary Judgment Because the Appellants'
    Interest was Not Cross Conveyed. . . . . 8

    The Trial Court Erred in Granting Appellee's Motion for
    Summary Judgment Because, Absent a Cross Conveyance
    of Appellants' Interest, Appellee Had No Authority to
    Tax Minerals not Located in its Jurisdiction . . . 10

Conclusion and Prayer . . . . . . . . 12

Certificate of Service . . . . . . . . 15

Certificate of Compliance . . . . . . 15

Appendix . . . . . . . . . 16

Lease Between Hunt Petroleum
Corporation and Oliver Lane Chambers . . . 17

Lease Between Hunt Petroleum
Corporation and Donna Kay Chambers-Jones . . 20

Lease Between Hunt Petroleum
Corporation and Rhonda Thompson . . . . 23

Texas Constitution Article 8, § 11 . . . . 24

Texas Tax Code § 1.04 . . . . . . 25

Texas Tax Code § 6.02 . . . . . . 29

Texas Tax Code § 21.01 . . . . . . 30

# Table of Authorities

**RULES**

TEX. R. CIV. P. 166A(C) ............................................................................ 7

**TEXAS CONSTITUTION**

TEX. CONST. art. VIII, § 11 ...................................................................... 11

**STATUTES**                                                                        **PAGE**

TEX. TAX CODE §1.04(2) .......................................................................... 11

TEX. TAX CODE §6.02(a) ........................................................................... 11

TEX. TAX CODE §21.01 .............................................................................. 11

**CASES**                                                                           **PAGE**

*Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989) ....................................... 8

*Chesapeake Exploration, L.L.C. v. Hyder*,
427 S.W.3d 472 (Tex. App.—San Antonio 2014, pet. filed). ...........................9

*Cincinnati Life Ins. Co. v. Cates,*
927 S.W.2d 623, 626 (Tex. 1996)................................................................. 8

*FM Props. Operating Co. v. City of Austin*,
22 S.W.3d 868, 872 (Tex. 2000)................................................................... 7

*Haase v. Glazner,* 62 S.W.3d 795, 797 (Tex. 2001)........................................ 8

*Jones v. Killingsworth,* 403 S.W.2d 325, 327 (Tex.1965).............................. 8

*Oak v. Collin County*, 692 S.W.2d 454, 455 (Tex. 1985) ............................... 11

*Sheffield v. Hogg,* 77 S.W.2d 1021, 1030 (Tex. 1934).................................... 11

*Southeastern Pipe Line Co. v. Tichacek,*
997 S.W.2d 166, 170(Tex. 1999)...................................................................... 9

*Southwestern Elec. Power Co. v. Grant*,
73 S.W.3d 211, 215 (Tex. 2002).................................................................... 7

## STATEMENT REGARDING ORAL ARGUMENT

Appellants do not request oral argument at this time. Appellants believe that the issues are easily understood and are clearly presented in their written brief and that oral argument is not necessary and would not further assist the Court in making its ruling.

## REFERENCES TO THE RECORD

*Clerk's Record:* There is 1 Volume of the Clerk's Record. All references to the Clerk's record will be made in the following fashion: CR Vol. v, p, where v represents the volume of the record and p represents the page number found in same.

This brief is filed on behalf of Appellants, Oliver Lane Chambers, et al, by April Gregston Prince, Attorney at Law.

## Statement of the Case

### Nature of the Case

This appeal is from a grant of summary judgment in favor of Appellee, San Augustine County Appraisal District, regarding the application of the Texas Tax Code to certain mineral interest, specifically the geographic reach of a taxing unit when mineral interest which lie entirely in another county have been pooled with minerals inside the taxing unit's authority.

### Course of Proceedings

On August 30, 2013, Appellants filed suit against San Augustine County Appraisal District seeking judicial review of the San Augustine County Appraisal Review Board's decision to tax certain mineral interests owned by Appellants in Shelby County, Texas. (C.R. Vol. 1, pg. 5).

On September 30, 2013, San Augustine County Appraisal District filed its Original Answer asserting a general denial. (C.R. Vol. 1, pg. 52).

On January 20, 2015 San Augustine County Appraisal District filed its Motion for Summary Judgment asserting that because Appellants had "cross-conveyed, pooled and unitized their mineral interests with other

1

mineral interests lying within the boundaries of San Augustine, Texas, [Appellants] had the obligation to pay taxes on said mineral interests within the Unit to the extent they lie within the boundaries of San Augustine [County] Texas". (C.R. Vol. 1, pg. 91-94).

On March 20, 2015, Appellants filed a response to San Augustine County Appraisal District's Motion for Summary Judgment. (C.R. Vol. 1, pg. 125).

On April 2, 2015, San Augustine County Appraisal District filed a reply to Appellants' Response to Motion for Summary Judgment. (C.R. Vol. 1, pg. 151).

San Augustine County Appraisal District's Motion for Summary Judgment was heard by submission on March 27, 2015. (C.R. Vol. 1, pg 72).

On June 23, 2015, the Court granted San Augustine County Appraisal District's Motion for Summary Judgment. (C.R. Vol. 1, pg. 166).

On July 15, 2015, the Court entered a Final Judgment in favor of San Augustine County Appraisal District. (C.R. Vol. 1, pg. 166).

On July 7, 2015, Appellants filed a Notice of Appeal. (C.R. Vol. 1; pg. 170).

On July 17, 2015, Appellants filed an Amended Notice of Appeal to

reflect the date the Final Judgment was signed by the trial court. (C.R. Vol. 1, pg. 172).

## Issues Presented

### Appellants' First Point of Error

The Trial Court Erred in Granting Appellee's Motion for Summary Judgment Because the Appellants' Interest Was Not Cross Conveyed.

### Appellants' Second Point of Error

The Trial Court Erred in Granting Appellee's Motion for Summary Judgment Because Absent a Cross Conveyance of Appellants' Interest, Appellee Had No Authority to Tax Minerals not Located in its jurisdiction.

## Statement of Facts

On August 31, 2007, Oliver Lane Chambers, Donna Kay Chambers-Jones, Rhonda Thompson, Clinton L. Chambers and wife, Brandi N. Chambers (collectively "Appellants" herein) each entered into Oil and Gas Leases (hereinafter collectively "the Leases") with Hunt Petroleum Corporation (Hunt Petroleum Corporation was subsequently acquired by XTO Energy, Inc.). (C.R. Vol. 1, pg. 81- 90).

The Leases covered Appellants' interest in 652 acres of land, more or less, all of said land lying solely within the boundaries Shelby County, Texas (hereafter the "Chambers Interest"). (C.R. Vol. 1, pg. 81-90). Appellee does not dispute that all of Appellants' surface interest (from which Appellants' minerals arise) lies solely within Shelby County, Texas

4

and that none of Appellants' surface interest (and thus none of their mineral interest) is located in San Augustine County, Texas. (C.R. Vol. 1, pg. 91, paragraph 2).

Contained in the terms of the Leases was a provision that stipulated: "[t]he formation of any unit hereunder which includes land not covered by this lease *shall not have the effect of exchanging or transferring any interest under this lease* (including, without limitation, any shut-in royalty which may become payable under this lease) between parties owning interest in land covered by this lease and parties owning interests in land not covered by this lease." (C.R. Vol. 1, pg. 131, 135, and 139)(emphasis added).

On July 2, 2010, the Chambers Interest was included in two production units, the Tigers DU No. 1H ("Tigers Unit") and the Wolfpack (SL) DU No. 1H ("Wolfpack Unit"). (C.R. Vol. 1, pg. 11-12). Also contained in the Tigers Unit and Wolfpack Unit were interest from land located in San Augustine County. *Id.*

The Tigers Unit contains 714.839 acres in total with 39.959 of those acres (5.59%) located in San Augustine County and the remainder located in Shelby County, Texas. (C.R. Vol. 1, pg. 114-120).

The Wolfpack Unit contains 694.9611 acres in total with 15.289 of

those acres (2.2%) located in San Augustine County and the remainder located in Shelby County, Texas. (C.R. Vol. 1, pg. 97-113).

San Augustine County Appraisal District ("SCAD") assessed ad valorem taxes on all of the royalty interest owners whose interest were included in both the Wolfpack Unit and Tigers Unit. As a result, SCAD taxed each owner in the Tigers Unit as if 5.59% of their interest was located in San Augustine, and each owner in the Wolfpack Unit as if 2.2% of their interest was located in San Augustine, regardless of the actual situs of the owners interest.

On May 24, 2013, Appellants timely filed a notice of protest with the Appraisal Review Board of San Augustine County to dispute the assessment. (C.R. Vol. 1 pg. 22-36). After a hearing, the Appraisal Review Board of San Augustine County issued a written order upholding the authority of San Augustine County Appraisal District to assess taxes on the Chambers Interest.

## Summary of Argument

The Texas Tax Code gives a taxing authority the power to tax property that lies within its jurisdictional boundaries only. Absent cross conveyance of royalty interests with royalty interest located in its jurisdiction, a taxing authority has no ability to tax royalty interest appurtenant to land which is not located within its jurisdictional boundaries.

In the case at hand, because the royalty interest at issue is appurtenant to land located entirely outside the jurisdictional authority of the SCAD, and because the Leases in question expressly prevented cross conveying of any interests, SCAD has no authority to tax Appellants' royalty interest and thus, the trial court's grant of summary judgment in favor of SCAD in this case was erroneous.

## ARGUMENT

The trial court's grant of summary judgment in favor of Appellee should be reviewed de novo. *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). When reviewing a summary judgment, the Court should take as true all evidence favorable to the nonmovant, and indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). Under TEX. R. CIV. P. 166a(c), the party moving for

summary judgment bears the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Haase v. Glazner*, 62 S.W.3d 795, 797 (Tex. 2001).

Because the trial court's order does not specify the grounds for its summary judgment, we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989).

For the reasons stated below, the Trial Court erred in granting Appellee's Motion for Summary Judgment.

## A.     The Trial Court Erred in Granting Appellee's Motion for Summary Judgment Because the Appellants' Interest was Not Cross Conveyed.

The trial court erred in this case by granting summary judgment in favor of SCAD by finding that the Chambers Interest was cross conveyed with other royalty interests located in San Augustine County, Texas.

The unitization of the Chambers Interest is a form of voluntary pooling made possible only by the pooling clause contained in the Leases, thus any pooling or unitization must comply with the express conditions found in the Leases. A lessee has no power to pool without the lessor's express authorization, which is contained in the lease's pooling clause. *See Jones v.*

8

*Killingsworth,* 403 S.W.2d 325, 327 (Tex.1965). For pooling to be valid, it must be done in accordance with the method and purposes specified in the lease. *See Southeastern Pipe Line Co. v. Tichacek,* 997 S.W.2d 166, 170 (Tex. 1999), citing *Jones v. Killingsworth,* 403 S.W.2d 325, 327-28 (Tex. 1965). A lessor's land may be pooled only to the extent stipulated in the lease. *Jones v. Killingsworth*, 403 S.W.2d 325, 327.

In the case at hand, the Leases authorized the pooling of the Chambers Interest, however, the Leases, by their express language, limited the effect of such pooling. The exact text of the limitation on pooling contained in the Leases is as follows:

> "[t]he formation of any unit hereunder which includes land not covered by this lease shall not have the effect of exchanging or transferring any interest under this lease (including, without limitation, any shut-in royalty which may become payable under this lease) between parties owning interest in land covered by this lease and parties owning interests in land not covered by this lease." (C.R. Vol. 1, pg. 131, 135, and 139).

An oil and gas lease is a contract and must be interpreted as a contract. *Chesapeake Exploration, L.L.C. v. Hyder*, 427 S.W.3d 472, 475 (Tex. App.— San Antonio 2014, pet. filed). Contract language that can be given a certain or definite meaning is not ambiguous and is construed as a matter of law. *Id*. In construing an unambiguous lease, the court's primary duty is to ascertain the parties' intent as expressed by the words of their agreement. *Id*. In doing so,

the court considers the wording of the lease in light of the circumstances surrounding its adoption and applies the rules of construction to determine its meaning. *Id.* A court must give contractual terms their plain and ordinary meaning unless the instrument shows the parties' intent to use the terms in a different sense. *Id.*

In the case at hand, neither Appellants nor Appellee raised any issue of ambiguity in the Leases that would require the trial court to determine if the Leases were ambiguous; accordingly, the Leases should be given their plain, ordinary, and generally accepted meaning.

Consequently, because the terms of the Leases expressly prevented any cross conveyance from occurring when a unit was formed, the Chambers Interest could not have been cross conveyed with any interests in San Augustine County.

Appellee's sole argument for the grant of summary judgment in its favor was the fact that the taxing authority had the ability to tax the Chambers Interest, which was solely located in Shelby County, Texas, because it was cross conveyed by virtue of pooling. Based on the express terms of the Leases cross conveying of the interest was not possible, thus, the Court erred in granting summary judgment in favor of Appellee.

**B.** **The Trial Court Erred in Granting Appellee's Motion for Summary Judgment Because, Absent a Cross Conveyance of**

**Appellants' Interest, Appellee Had No Authority to Tax Minerals not Located in its Jurisdiction.**

The Texas Constitution provides that all property shall be assessed for taxation in the county where it is located. TEX. CONST. ART. VIII, § 11.

It is undisputed that royalty interests, like the Chambers Interest are an interest in real property, and taxable as such. *Sheffield v. Hogg,* 77 S.W.2d 1021, 1030 (Tex. 1934)*;* and TEXAS TAX CODE § 1.04(2).

Section 21.01 of the TEXAS TAX CODE provides that "real property is taxable by a taxing unit if located in the unit on January 1." The burden of proof lies with the taxing unit to prove that the property it seeks to assess is located in its jurisdictional limits. *Oak v. Collin County*, 692 S.W.2d 454, 455 (Tex. 1985).

The Texas Tax Code further defines the boundaries of an appraisal district as being the same as the boundaries of the county. TEX. TAX CODE § 6.02(a)

As such, the Chambers Interest may only be taxed by SCAD, if it is located in San Augustine County. *See* TEXAS TAX CODE §21.01.

In the case at hand, SCAD does not dispute that the surface estate out of which the Chambers Interest was created lies exclusively in Shelby County, Texas, outside the jurisdictional taxing unit for SCAD. (C.R. Vol. 1, pg. 91).

11

As such, because the Leases contain a contractual provision preventing cross conveyance of the Appellants' royalty interest, SCAD has no authority, be it constitutional, statutory or otherwise, to tax the Appellants' interest.

Because SCAD does not have the ability to tax the Appellants' interest, the trial court erred in granting summary judgment in favor of SCAD.

It is important to note that in the case at hand, Appellants are not attempting to avoid paying tax on all their royalty interest. Appellants simply want to pay all of the taxes owed on their royalty interest to the County in which their property is located, pursuant to the requirements of the Texas Constitution and Texas Tax Code as set forth hereinabove.

## CONCLUSION AND PRAYER

WHEREFORE PREMISES CONSIDERED, Appellants, Oliver Lane Chambers, Donna Kay Chambers-Jones, Rhonda Thompson, Clinton L. Chambers and wife, Brandi N. Chambers respectfully request that the Court reverse the Trial Court's grant of Summary Judgment in favor of Appellee San Augustine County Appraisal District and render Judgment in favor of Appellants, Oliver Lane Chambers, Donna Kay Chambers-Jones, Rhonda Thompson, Clinton L. Chambers and wife, Brandi N. Chambers, or in the

12

alternative reverse and remand this case back to the trial court on all causes for further proceedings. Appellant further respectfully requests that this Court grant Appellant any and all such other and further relief to which it may be justly entitled.

Respectfully Submitted,

METTAUER LAW FIRM, PLLC
Attorneys & Counselors at Law

___/s/ April Gregston Prince____
**April Gregston Prince**
**State Bar No. 24047247**
**april@mettauerlaw.com**
**Lead Counsel**
Gavin I. Midgley
State Bar No. 24092832
gavin@mettauerlaw.com
403 Nacogdoches Street, Suite 1
P.O. Box 2016
Center, Texas 75935
(936) 598-9400 (Phone)
(936) 598-6122 (Facsimile)
**ATTORNEYS FOR**
**APPELLANTS, OLIVER LANE**
**CHAMBERS, DONNA KAY**
**CHAMBERS-JONES, RHONDA**
**THOMPSON, CLINTON L.**
**CHAMBERS AND WIFE,**
**BRANDI  N. CHAMBERS**

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 16 day of September, 2015, I served a copy of the foregoing document on the following counsel and/or interested parties by Certified Mail Return Receipt Requested:

Jeff Bates
Guidry, Bates & Hoyt
118 E. Hospital Street, Ste. 100
Nacogdoches, Texas 75961

__/s/ April Gregston Prince____
April Gregston Prince

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that, pursuant to TEX. R. APP. P. 9.4(i)(3), the number of words contained in this document is 3,339.

___/s/ April Gregston Prince___
April Gregston Prince

# APPENDIX

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

Producers 88 (7-69) Paid Up

With 640 Acres Pooling Provision

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this **31st** day of **August, 2007**, between,

**Oliver Lane Chambers**, dealing with his sole and separate property, Lessor (whether one or more),

whose address is Rt. 1 Box 239 San Augustine, TX 75972.

And **Hunt Petroleum Corporation, 1601 Elm Street, Suite 4700 Dallas, Texas 75201-7254**, Lessee,

WITNESSETH:

1. Lessor, in consideration of TEN DOLLARS AND OTHER VALUABLE CONSIDERATION receipt of which is hereby acknowledged, and of the covenants and agreements of lessee hereinafter contained, does hereby grant, lease and let unto lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas, sulphur and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, telephone lines, employee houses and other structures on said land, necessary or useful in lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any other land adjacent thereto. The land covered hereby, herein called "said land", is located in the County of     **Shelby**     ,     State of **Texas**     , and is described as follows:

**SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR PROPERTY DESCRIPTION AND ADDITIONAL LEASE PROVISIONS.**

This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain     **652**     acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights and options hereunder.

2. Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of three **(3) years** from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3. As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipeline to which lessee may connect its wells, the equal one-eighth part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such one-eighth part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear one-eighth of the cost of treating oil to render it marketable pipe line oil, (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, one-eighth of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of one-eighth of such gas and casinghead gas; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one-tenth either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing oil or gas, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, and may be deposited in the _____**Pay directly to Lessor**_____ at _____**above address**_____, or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownerships thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4. Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease with any other land covered by this lease, and/or with any other land, lease, or leases, as to any or all minerals or horizons, so as to establish units containing not more than 80 surface acres, plus 10% acreage tolerance; provided, however, units may be established as to any one or more horizons, or existing units may be enlarged as to any one or more horizons, so as to contain not more than 640 surface acres plus 10% acreage tolerance, if limited to one or more of the following: (1) gas, other than casinghead gas, (2) liquid hydrocarbons (condensate) which are not liquids in the subsurface reservoir, (3) minerals produced from wells classified as gas wells by the conservation agency having jurisdiction. If larger units than any of those herein permitted, either at the time established, or after enlargement, are required under any governmental rule or order, for the drilling or operation of a well at a regular location, or for obtaining maximum allowable from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged to conform to the size required by such governmental order or rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of said options may be exercised by lessee at any time and from time to time while this lease is in force, and whether before or after production has been established either on said land, or on the portion of said land included in the unit, or on other land unitized therewith. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be mineral, royalty, or leasehold interests in lands within the unit, which are not effectively pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted upon said land under this lease. There shall be allocated to the land covered by this lease within each such unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) that proportion of the total production of unitized minerals from the unit, after deducting any used in lease or unit operations, which the number of surface acres in such land (or in each such separate tract) covered by this lease within the unit bears to the total number of surface acres in the unit, and the production so allocated shall be considered for all purposes, including payment or delivery of royalty, overriding royalty and any other payments out of production, to be the entire production of unitized minerals from the land to which allocated in the same manner as though produced therefrom under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of any unit hereunder which includes land not covered by this lease shall not have the effect of exchanging or transferring any interest under this lease (including, without limitation, any shut-in royalty which may become payable under this lease) between parties owning interests in land covered by this lease and parties owning interests in land not covered by this lease. Neither shall it impair the right of lessee to release as provided in Paragraph 5 hereof, except that lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are released as to lands within the unit. At any time while this lease is in force lessee may dissolve any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. If this lease now or hereafter covers separate tracts, no pooling or unitization of royalty interests as between any such separate tracts is intended or shall be implied or result merely from the inclusion of such separate tracts within this lease but lessee shall nevertheless have the right to pool or unitize as provided in this paragraph 4 with consequent allocation of production as herein provided. As used in this paragraph 4, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the leased premises.

5. Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations, as to the released acreage or interest.

6. Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

3050-0258-06

7. Lessee shall have the use, free from royalty, of water, other than from lessor's water wells, and of oil and gas produced from said land in all operations hereunder. Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing. No well shall be drilled nearer than 1000 feet to the house or barn now on said land without the consent of the lessor. Lessee shall pay for damages caused by its operations to growing crops and timber on said land.

8. The rights and estate of any party hereto may be assigned from time to time in whole or in part and as to any mineral or horizon. All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns. No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of lessee, including, but not limited to, the location and drilling of wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof of or to lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by lessor or lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of the death of the owner, lessee may, nevertheless pay or tender such royalties, or other moneys, or part thereof, to the credit of the decedent in a depository bank provided for above.

9. In the event lessor considers that lessee has not complied with all its obligations hereunder, both express and implied, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor. The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee. Neither the service of said notice nor the doing of any acts by lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that lessee has failed to perform all its obligations hereunder. If this lease is canceled for any cause, it shall nevertheless remain in force and effect as to (1) sufficient acreage around each well as to which there are operations to constitute a drilling or maximum allowable unit under applicable governmental regulations, (but in no event less than forty acres), such acreage to be designated by lessee as nearly as practicable in the form of a square centered at the well, or in such shape as then existing spacing rules require; and (2) any part of said land included in a pooled unit on which there are operations. Lessee shall also have such easements on said land as are necessary to operations on the acreage so retained.

10. Lessor hereby warrants and agrees to defend title to said land against the claims of all persons whomsoever. Lessor's rights and interests hereunder shall be charged primarily with any mortgages, taxes or other liens, or interest and other charges on said land, but lessor agrees that lessee shall have the right at any time to pay or reduce same for lessor, either before or after maturity, and be subrogated to the rights of the holder thereof and to deduct amounts so paid from royalties or other payments payable or which may become payable to lessor and/or assigns under this lease. If this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether lessor's interest is herein specified or not), or no interest therein, then the royalties and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by lessor) shall be paid out of the royalty herein provided. This lease shall be binding upon each party who executes it without regard to whether it is executed by all those named herein as lessor.

11. If, while this lease is in force, at, or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and lessee is not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delay had not occurred.

12. [Pugh clause] At the end of the primary term of this lease, all acreage not then included in a unit(s) will expire unless: A.) Lessee is currently engaged in actual drilling operations up said land, or Lessee is drilling upon acreage that has been pooled with said land; or B.) Lessee commences operations for the drilling of a well within 180 days from the date a previous well has been completed either as a dry hole or as a producer. Lessee shall have the option to continue drilling on said land or acreage pooled with said land thereafter, by not allowing more than 180 days to lapse between the completion and drilling of wells. At such time as more than 180 days lapse without additional drilling after the primary term has expired, all acreage not included in a producing unit will revert to the Lessor.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.



Oliver Lane Chambers, dealing with his sole and separate property

# ACKNOWLEDGEMENT

STATE OF TEXAS }

COUNTY OF }

This instrument was acknowledged before me on the ___12___ day of __SEPTEMBER__, 2007, by Oliver Lane Chambers, dealing with his sole and separate property.

_____
Notary Public, State of Texas

LARRY D. TEDFORD
Notary Public, State of Texas
My Commission Expires
January 30, 2011

## EXHIBIT "A"

Attached to and made a part hereof that certain Oil, Gas and Mineral Lease dated August 31, 2007, and executed by Oliver Lane Chambers, dealing with his sole and separate property, as Lessor, and Hunt Petroleum Corporation, as Lessee.

Property description: Being **652** acres of land, more or less, a part of the Jonathan Anderson Survey, A-5, Shelby County, Texas, and being the same land described in that certain Warranty Deed dated October 24, 1962, from Virginia B. Davis, James A. Davis and wife, Alice Ray Davis, as Grantor, to N. L. Tindall, as Grantee, and recorded in Volume 402, Page 635, of the Deed Records of Shelby County, Texas.

**The provisions of the hereinafter paragraphs shall supersede and govern the provisions in the printed form text of this lease and shall inure to the benefit of, and be binding upon the parties hereto and their respective heirs, representatives, successors and assigns.**

13. Notwithstanding anything appearing herein to the contrary, the royalty provided for in paragraph three of the printed form of this lease shall be one fifth (1/5th) rather than one-eighth (1/8th).

14. In the event that larger units than those permitted under Paragraph Four (4) are prescribed or permitted under any governmental rule or order (including, without limitation, field statewide rules, as applicable, of the Railroad Commission of Texas) for the drilling or operation of horizontal or directional well drilled at a regular location, or for obtaining maximum, allowable production from any horizontal or directional well drilled thereon, acreage from this lease may be pooled or unitized with other acreage to establish units which conform to the size prescribed or permitted by such rule or order.

15. This lease covers and includes oil, gas, and associated liquid hydrocarbons, all other minerals being reserved to lessor, including coal and lignite.

16. Lessee shall pay to the surface estate owners all damages, to said lands and the buildings, improvements, livestock, fences, crops, pastures, lakes, trees and timber thereon, caused by Lessee's operations;

17. Lessee shall back-fill all pits and excavations made by Lessee on the leased premises as soon as the ground has dried sufficiently, and shall remove all trash, junk, refuse and debris and otherwise restore the surface of the ground to its condition prior to Lessee's operations hereunder;

18. Lessee shall not have the right to use the ponds, lakes, wells, streams or water on the leased premises without Lessor's written consent first obtained, and Lessee shall avoid, to the best of its abilities, pollution of such waters in its operations hereunder;

19. Lessee shall not have the right to inject salt water or other fluids into the leased premises, or a well thereon or unitized therewith, for disposal purposes, nor the right to make any injections of gas, water, fluids or air except those necessary to improve production of oil and gas from a well on the leased premises;

20. Notwithstanding anything to the contrary contained herein, at the expiration of the primary term or any continuous drilling operations as provided in Paragraph Four (4), herein, whichever is the later, this lease shall terminate as to all depths below one hundred (100) feet below the stratigraphic equivalent of the deepest depth drilled.

21. Lessor's royalty shall be calculated free and clear of costs and expenses for exploration, drilling, development and production, including, but not limited to, dehydration, storage, compression, separation by mechanical means and product stabilization incurred prior to the production leaving the leased premises or prior to delivery into a pipeline or gathering system and administrative or other "overhead" charges. Lessor's royalty shall bear its proportionate share of ad valorem taxes, production, severance or other excise taxes and, if Lessor's royalty is calculated on the basis of the amount received by Lessee for the delivery of production at a location other than at the mouth of the well, the actual, reasonable costs incurred by Lessee to transport, compress, process, stabilize or treat the product off of the lease premises in order to make the production saleable, to increase its value or to get the production to a market.

22. Notwithstanding any provisions in this lease herein or elsewhere to the contrary, the shut-in royalty to be paid shall be ten (10) dollars per net mineral acre per year for each acre of land then covered hereby. The payment of shut-in royalty hereunder shall maintain this lease for a period of not more than two years in the aggregate after the commencement of shut-in royalty payments, and at the end of such two year period this lease shall terminate unless such gas is being produced and marketed by pipeline connections, subject to any and all governmental regulations.

**SIGNED FOR IDENTIFICATION:**

_Oliver Lane Chambers_

**Oliver Lane Chambers, dealing with his sole and separate property**

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

Producers 88 (7-69) Paid Up

With 640 Acres Pooling Provision

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this **31st** day of **August, 2007**, between,

**Donna Kay Chambers Jones**, dealing with her sole and separate property, Lessor (whether one or more),

whose address is Box 1544, Silsbee, TX 77656.

And **Hunt Petroleum Corporation, 1601 Elm Street, Suite 4700 Dallas, Texas 75201-7254**, Lessee,

WITNESSETH:

1. Lessor, in consideration of TEN DOLLARS AND OTHER VALUABLE CONSIDERATION receipt of which is hereby acknowledged, and of the covenants and agreements of lessee hereinafter contained, does hereby grant, lease and let unto lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas, sulphur and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, telephone lines, employee houses and other structures on said land, necessary or useful in lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any other land adjacent thereto. The land covered hereby, herein called "said land", is located in the County of **Shelby** . State of **Texas** , and is described as follows:

**SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR PROPERTY DESCRIPTION AND ADDITIONAL LEASE PROVISIONS.**

This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain **652** acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights and options hereunder.

2. Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of three (3) years from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3. As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipeline to which lessee may connect its wells, the equal one-eighth part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such one-eighth part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear one-eighth of the cost of treating oil to render it marketable pipe line oil, (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, one-eighth of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of one-eighth of such gas and casinghead gas; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one-tenth either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing oil or gas, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, and may be deposited in the **Pay directly to Lessor** at **above address** . or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownerships thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4. Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease with any other land covered by this lease, and/or with any other land, lease, or leases, as to any or all minerals or horizons, so as to establish units containing not more than 80 surface acres, plus 10% acreage tolerance; provided, however, units may be established as to any one or more horizons, or existing units may be enlarged as to any one or more horizons, so as to contain not more than 640 surface acres plus 10% acreage tolerance, if limited to one or more of the following: (1) gas, other than casinghead gas, (2) liquid hydrocarbons (condensate) which are not liquids in the subsurface reservoir, (3) minerals produced from wells classified as gas wells by the conservation agency having jurisdiction. If larger units than any of those herein permitted, either at the time established, or after enlargement, are required under any governmental rule or order, for the drilling or operation of a well at a regular location, or for obtaining maximum allowable from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged to conform to the size required by such governmental order or rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of said options may be exercised by lessee at any time and from time to time while this lease is in force, and whether before or after production has been established either on said land, or on the portion of said land included in the unit, or on other land unitized therewith. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be mineral, royalty, or leasehold interests in lands within the unit, which are not effectively pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted upon said land under this lease. There shall be allocated to the land covered by this lease within each such unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) that proportion of the total production of unitized minerals from the unit, after deducting any used in lease or unit operations, which the number of surface acres in such land (or in each such separate tract) covered by this lease within the unit bears to the total number of surface acres in the unit, and the production so allocated shall be considered for all purposes, including payment or delivery of royalty, overriding royalty and any other payments out of production, to be the entire production of unitized minerals from the land to which allocated in the same manner as though produced therefrom under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of any unit hereunder which includes land not covered by this lease shall not have the effect of exchanging or transferring any interest under this lease (including, without limitation, any shut-in royalty which may become payable under this lease) between parties owning interests in land covered by this lease and parties owning interests in land not covered by this lease. Neither shall it impair the right of lessee to release as provided in Paragraph 5 hereof, except that lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are released as to lands within the unit. At any time while this lease is in force lessee may dissolve any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. If this lease now or hereafter covers separate tracts, no pooling or unitization of royalty interests as between any such separate tracts is intended or shall be implied or result merely from the inclusion of such separate tracts within this lease but lessee shall nevertheless have the right to pool or unitize as provided in this paragraph 4 with consequent allocation of production as herein provided. As used in this paragraph 4, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the leased premises.

5. Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations, as to the released acreage or interest.

6. Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

3050-0258-05

7. Lessee shall have the use, free from royalty, of water, other than from lessor's water wells, and of oil and gas produced from said land in all operations hereunder. Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing. No well shall be drilled nearer than 1000 feet to the house or barn now on said land without the consent of the lessor. Lessee shall pay for damages caused by its operations to growing crops and timber on said land.

8. The rights and estate of any party hereto may be assigned from time to time in whole or in part and as to any mineral or horizon. All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns. No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of lessee, including, but not limited to, the location and drilling of wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof of or to lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by lessor or lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of the death of the owner, lessee may, nevertheless pay or tender such royalties, or other moneys, or part thereof, to the credit of the decedent in a depository bank provided for above.

9. In the event lessor considers that lessee has not complied with all its obligations hereunder, both express and implied, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor. The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee. Neither the service of said notice nor the doing of any acts by lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that lessee has failed to perform all its obligations hereunder. If this lease is canceled for any cause, it shall nevertheless remain in force and effect as to (1) sufficient acreage around each well as to which there are operations to constitute a drilling or maximum allowable unit under applicable governmental regulations, (but in no event less than forty acres), such acreage to be designated by lessee as nearly as practicable in the form of a square centered at the well, or in such shape as then existing spacing rules require; and (2) any part of said land included in a pooled unit on which there are operations. Lessee shall also have such easements on said land as are necessary to operations on the acreage so retained.

10. Lessor hereby warrants and agrees to defend title to said land against the claims of all persons whomsoever. Lessor's rights and interests hereunder shall be charged primarily with any mortgages, taxes or other liens, or interest and other charges on said land, but lessor agrees that lessee shall have the right at any time to pay or reduce same for lessor, either before or after maturity, and be subrogated to the rights of the holder thereof and to deduct amounts so paid from royalties or other payments payable or which may become payable to lessor and/or assigns under this lease. If this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether lessor's interest is herein specified or not), or no interest therein, then the royalties and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by lessor) shall be paid out of the royalty herein provided. This lease shall be binding upon each party who executes it without regard to whether it is executed by all those named herein as lessor.

11. If, while this lease is in force, at, or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and lessee is not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delay had not occurred.

12. [Pugh clause] At the end of the primary term of this lease, all acreage not then included in a unit(s) will expire unless: A.) Lessee is currently engaged in actual drilling operations up said land, or Lessee is drilling upon acreage that has been pooled with said land; or B.) Lessee commences operations for the drilling of a well within 180 days from the date a previous well has been completed either as a dry hole or as a producer. Lessee shall have the option to continue drilling on said land or acreage pooled with said land thereafter, by not allowing more than 180 days to lapse between the completion and drilling of wells. At such time as more than 180 days lapse without additional drilling after the primary term has expired, all acreage not included in a producing unit will revert to the Lessor.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

Donna Kay Chambers Jones, dealing with her sole and separate property

# ACKNOWLEDGEMENT

STATE OF TEXAS       }

COUNTY OF       }

This instrument was acknowledged before me on the _12_ day of _SEPTEMBER_, 2007, by Donna Kay Chambers Jones, dealing with her sole and separate property.

Notary Public, State of Texas

## EXHIBIT "A"

Attached to and made a part hereof that certain Oil, Gas and Mineral Lease dated August 31, 2007, and executed by Donna Kay Chambers, dealing with her sole and separate property, as Lessor, and Hunt Petroleum Corporation, as Lessee.

Property description: Being **652** acres of land, more or less, a part of the Jonathan Anderson Survey, A-5, Shelby County, Texas, and being the same land described in that certain Warranty Deed dated October 24, 1962, from Virginia B. Davis, James A. Davis and wife, Alice Ray Davis, as Grantor, to N. L. Tindall, as Grantee, and recorded in Volume 402, Page 635, of the Deed Records of Shelby County, Texas.

**The provisions of the hereinafter paragraphs shall supersede and govern the provisions in the printed form text of this lease and shall inure to the benefit of, and be binding upon the parties hereto and their respective heirs, representatives, successors and assigns.**

13. Notwithstanding anything appearing herein to the contrary, the royalty provided for in paragraph three of the printed form of this lease shall be one fifth (1/5th) rather than one-eighth (1/8th).

14. In the event that larger units than those permitted under Paragraph Four (4) are prescribed or permitted under any governmental rule or order (including, without limitation, field statewide rules, as applicable, of the Railroad Commission of Texas) for the drilling or operation of horizontal or directional well drilled at a regular location, or for obtaining maximum, allowable production from any horizontal or directional well drilled thereon, acreage from this lease may be pooled or unitized with other acreage to establish units which conform to the size prescribed or permitted by such rule or order.

15. This lease covers and includes oil, gas, and associated liquid hydrocarbons, all other minerals being reserved to lessor, including coal and lignite.

16. Lessee shall pay to the surface estate owners all damages, to said lands and the buildings, improvements, livestock, fences, crops, pastures, lakes, trees and timber thereon, caused by Lessee's operations;

17. Lessee shall back-fill all pits and excavations made by Lessee on the leased premises as soon as the ground has dried sufficiently, and shall remove all trash, junk, refuse and debris and otherwise restore the surface of the ground to its condition prior to Lessee's operations hereunder;

18. Lessee shall not have the right to use the ponds, lakes, wells, streams or water on the leased premises without Lessor's written consent first obtained, and Lessee shall avoid, to the best of its abilities, pollution of such waters in its operations hereunder;

19. Lessee shall not have the right to inject salt water or other fluids into the leased premises, or a well thereon or unitized therewith, for disposal purposes, nor the right to make any injections of gas, water, fluids or air except those necessary to improve production of oil and gas from a well on the leased premises;

20. Notwithstanding anything to the contrary contained herein, at the expiration of the primary term or any continuous drilling operations as provided in Paragraph Four (4), herein, whichever is the later, this lease shall terminate as to all depths below one hundred (100) feet below the stratigraphic equivalent of the deepest depth drilled.

21. Lessor's royalty shall be calculated free and clear of costs and expenses for exploration, drilling, development and production, including, but not limited to, dehydration, storage, compression, separation by mechanical means and product stabilization incurred prior to the production leaving the leased premises or prior to delivery into a pipeline or gathering system and administrative or other "overhead" charges. Lessor's royalty shall bear its proportionate share of ad valorem taxes, production, severance or other excise taxes and, if Lessor's royalty is calculated on the basis of the amount received by Lessee for the delivery of production at a location other than at the mouth of the well, the actual, reasonable costs incurred by Lessee to transport, compress, process, stabilize or treat the product off of the lease premises in order to make the production saleable, to increase its value or to get the production to a market.

22. Notwithstanding any provisions in this lease herein or elsewhere to the contrary, the shut-in royalty to be paid shall be ten (10) dollars per net mineral acre per year for each acre of land then covered hereby. The payment of shut-in royalty hereunder shall maintain this lease for a period of not more than two years in the aggregate after the commencement of shut-in royalty payments, and at the end of such two year period this lease shall terminate unless such gas is being produced and marketed by pipeline connections, subject to any and all governmental regulations.

**SIGNED FOR IDENTIFICATION:**

_Donna Kay Chambers Jones_

Donna Kay Chambers Jones, dealing with her sole and separate property.

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

Producers 88 (7-69) Paid Up

With 640 Acres Pooling Provision

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this **31st** day of **August, 2007**, between,

**Rhonda Thompson**, dealing with her sole and separate property, Lessor (whether one or more),

whose address is Rt. 1 Box 234 San Augustine, TX 75972.

And **Hunt Petroleum Corporation**, 1601 Elm Street, Suite 4700 Dallas, Texas 75201-7254, Lessee,

WITNESSETH:

1. Lessor, in consideration of TEN DOLLARS AND OTHER VALUABLE CONSIDERATION receipt of which is hereby acknowledged, and of the covenants and agreements of lessee hereinafter contained, does hereby grant, lease and let unto lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas, sulphur and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, telephone lines, employee houses and other structures on said land, necessary or useful in lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any other land adjacent thereto. The land covered hereby, herein called "said land", is located in the County of **Shelby**, State of **Texas**, and is described as follows:

**SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR PROPERTY DESCRIPTION AND ADDITIONAL LEASE PROVISIONS.**

This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain **652** acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights and options hereunder.

2. Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of three (**3**) years from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3. As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipeline to which lessee may connect its wells, the equal one-eighth part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such one-eighth part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear one-eighth of the cost of treating oil to render it marketable pipe line oil, (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, one-eighth of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of one-eighth of such gas and casinghead gas; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one-tenth either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing oil or gas, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, and may be deposited in the _____ **Pay directly to Lessor** _____ at _____ **above address** _____ or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownerships thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4. Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease with any other land covered by this lease, and/or with any other land, lease, or leases, as to any or all minerals or horizons, so as to establish units containing not more than 80 surface acres, plus 10% acreage tolerance; provided, however, units may be established as to any one or more horizons, or existing units may be enlarged as to any one or more horizons, so as to contain not more than 640 surface acres plus 10% acreage tolerance, if limited to one or more of the following: (1) gas, other than casinghead gas, (2) liquid hydrocarbons (condensate) which are not liquids in the subsurface reservoir, (3) minerals produced from wells classified as gas wells by the conservation agency having jurisdiction. If larger units than any of those herein permitted, either at the time established, or after enlargement, are required under any governmental rule or order, for the drilling or operation of a well at a regular location, or for obtaining maximum allowable from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged to conform to the size required by such governmental order or rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of said options may be exercised by lessee at any time and from time to time while this lease is in force, and whether before or after production has been established either on said land, or on the portion of said land included in the unit, or on other land unitized therewith. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be mineral, royalty, or leasehold interests in lands within the unit, which are not effectively pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted upon said land under this lease. There shall be allocated to the land covered by this lease within each such unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) that proportion of the total production of unitized minerals from the unit, after deducting any used in lease or unit operations, which the number of surface acres in such land (or in each such separate tract) covered by this lease within the unit bears to the total number of surface acres in the unit, and the production so allocated shall be considered for all purposes, including payment or delivery of royalty, overriding royalty and any other payments out of production, to be the entire production of unitized minerals from the land to which allocated in the same manner as though produced therefrom under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of any unit hereunder which includes land not covered by this lease shall not have the effect of exchanging or transferring any interest under this lease (including, without limitation, any shut-in royalty which may become payable under this lease) between parties owning interests in land covered by this lease and parties owning interests in land not covered by this lease. Neither shall it impair the right of lessee to release as provided in Paragraph 5 hereof, except that lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are released as to lands within the unit. At any time while this lease is in force lessee may dissolve any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. If this lease now or hereafter covers separate tracts, no pooling or unitization of royalty interests as between any such separate tracts is intended or shall be implied or result merely from the inclusion of such separate tracts within this lease but lessee shall nevertheless have the right to pool or unitize as provided in this paragraph 4 with consequent allocation of production as herein provided. As used in this paragraph 4, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the leased premises.

5. Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations, as to the released acreage or interest.

6. Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

0345246

3050-0258-07

7. Lessee shall have the use, free from royalty, of water, other than from lessor's water wells, and of oil and gas produced from said land in all operations hereunder. Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing. No well shall be drilled nearer than **1000** feet to the house or barn now on said land without the consent of the lessor. Lessee shall pay for damages caused by its operations to growing crops and timber on said land.

8. The rights and estate of any party hereto may be assigned from time to time in whole or in part and as to any mineral or horizon. All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns. No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of lessee, including, but not limited to, the location and drilling of wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof of or to lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by lessor or lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of the death of the owner, lessee may, nevertheless pay or tender such royalties, or other moneys, or part thereof, to the credit of the decedent in a depository bank provided for above.

9. In the event lessor considers that lessee has not complied with all its obligations hereunder, both express and implied, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor. The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee. Neither the service of said notice nor the doing of any acts by lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that lessee has failed to perform all its obligations hereunder. If this lease is canceled for any cause, it shall nevertheless remain in force and effect as to (1) sufficient acreage around each well as to which there are operations to constitute a drilling or maximum allowable unit under applicable governmental regulations, (but in no event less than forty acres), such acreage to be designated by lessee as nearly as practicable in the form of a square centered at the well, or in such shape as then existing spacing rules require; and (2) any part of said land included in a pooled unit on which there are operations. Lessee shall also have such easements on said land as are necessary to operations on the acreage so retained.

10. Lessor hereby warrants and agrees to defend title to said land against the claims of all persons whomsoever. Lessor's rights and interests hereunder shall be charged primarily with any mortgages, taxes or other liens, or interest and other charges on said land, but lessor agrees that lessee shall have the right at any time to pay or reduce same for lessor, either before or after maturity, and be subrogated to the rights of the holder thereof and to deduct amounts so paid from royalties or other payments payable or which may become payable to lessor and/or assigns under this lease. If this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether lessor's interest is herein specified or not), or no interest therein, then the royalties and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by lessor) shall be paid out of the royalty herein provided. This lease shall be binding upon each party who executes it without regard to whether it is executed by all those named herein as lessor.

11. If, while this lease is in force, at, or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and lessee is not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delay had not occurred.

12. [Pugh clause] At the end of the primary term of this lease, all acreage not then included in a unit(s) will expire unless: A.) Lessee is currently engaged in actual drilling operations up said land, or Lessee is drilling upon acreage that has been pooled with said land; or B.) Lessee commences operations for the drilling of a well within 180 days from the date a previous well has been completed either as a dry hole or as a producer. Lessee shall have the option to continue drilling on said land or acreage pooled with said land thereafter, by not allowing more than 180 days to lapse between the completion and drilling of wells. At such time as more than 180 days lapse without additional drilling after the primary term has expired, all acreage not included in a producing unit will revert to the Lessor.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.



**Rhonda Thompson, dealing with her sole and separate property**

# ACKNOWLEDGEMENT

STATE OF TEXAS                    }

COUNTY OF                         }

This instrument was acknowledged before me on the _____12_____ day of _SEPTEMBER_____, 2007, by Rhonda Thompson, dealing with her sole and separate property.

Notary Public, State of Texas

LARRY D. TEDFORD
Notary Public, State of Texas
My Commission Expires
January 30, 2011

## EXHIBIT "A"

Attached to and made a part hereof that certain Oil, Gas and Mineral Lease dated August 31, 2007, and executed by Rhonda Thompson, dealing with her sole and separate property, as Lessor, and Hunt Petroleum Corporation, as Lessee.

Property description: Being **652** acres of land, more or less, a part of the Jonathan Anderson Survey, A-5, Shelby County, Texas, and being the same land described in that certain Warranty Deed dated October 24, 1962, from Virginia B. Davis, James A. Davis and wife, Alice Ray Davis, as Grantor, to N. L. Tindall, as Grantee, and recorded in Volume 402, Page 635, of the Deed Records of Shelby County, Texas.

**The provisions of the hereinafter paragraphs shall supersede and govern the provisions in the printed form text of this lease and shall inure to the benefit of, and be binding upon the parties hereto and their respective heirs, representatives, successors and assigns.**

13. Notwithstanding anything appearing herein to the contrary, the royalty provided for in paragraph three of the printed form of this lease shall be one fifth (1/5th) rather than one-eighth (1/8th).

14. In the event that larger units than those permitted under Paragraph Four (4) are prescribed or permitted under any governmental rule or order (including, without limitation, field statewide rules, as applicable, of the Railroad Commission of Texas) for the drilling or operation of production of horizontal or directional well drilled at a regular location, or for obtaining maximum, allowable production from any horizontal or directional well drilled thereon, acreage from this lease may be pooled or unitized with other acreage to establish units which conform to the size prescribed or permitted by such rule or order.

15. This lease covers and includes oil, gas, and associated liquid hydrocarbons, all other minerals being reserved to lessor, including coal and lignite.

16. Lessee shall pay to the surface estate owners all damages, to said lands and the buildings, improvements, livestock, fences, crops, pastures, lakes, trees and timber thereon, caused by Lessee's operations;

17. Lessee shall back-fill all pits and excavations made by Lessee on the leased premises as soon as the ground has dried sufficiently, and shall remove all trash, junk, refuse and debris and otherwise restore the surface of the ground to its condition prior to Lessee's operations hereunder;

18. Lessee shall not have the right to use the ponds, lakes, wells, streams or water on the leased premises without Lessor's written consent first obtained, and Lessee shall avoid, to the best of its abilities, pollution of such waters in its operations hereunder;

19. Lessee shall not have the right to inject salt water or other fluids into the leased premises, or a well thereon or unitized therewith, for disposal purposes, nor the right to make any injections of gas, water, fluids or air except those necessary to improve production of oil and gas from a well on the leased premises;

20. Notwithstanding anything to the contrary contained herein, at the expiration of the primary term or any continuous drilling operations as provided in Paragraph Four (4), herein, whichever is the later, this lease shall terminate as to all depths below one hundred (100) feet below the stratigraphic equivalent of the deepest depth drilled.

21. Lessor's royalty shall be calculated free and clear of costs and expenses for exploration, drilling, development and production, including, but not limited to, dehydration, storage, compression, separation by mechanical means and product stabilization incurred prior to the production leaving the leased premises or prior to delivery into a pipeline or gathering system and administrative or other "overhead" charges. Lessor's royalty shall bear its proportionate share of ad valorem taxes, production, severance or other excise taxes and, if Lessor's royalty is calculated on the basis of the amount received by Lessee for the delivery of production at a location other than at the mouth of the well, the actual, reasonable costs incurred by Lessee to transport, compress, process, stabilize or treat the product off of the lease premises in order to make the production saleable, to increase its value or to get the production to a market.

22. Notwithstanding any provisions in this lease herein or elsewhere to the contrary, the shut-in royalty to be paid shall be ten (10) dollars per net mineral acre per year for each acre of land then covered hereby. The payment of shut-in royalty hereunder shall maintain this lease for a period of not more than two years in the aggregate after the commencement of shut-in royalty payments, and at the end of such two year period this lease shall terminate unless such gas is being produced and marketed by pipeline connections, subject to any and all governmental regulations.

**SIGNED FOR IDENTIFICATION:**

_Rhonda Thompson_
Rhonda Thompson, dealing with her sole and separate property

# Tex. Const. Art. VIII, § 11

This document is current through the 2015 regular session, 84th Legislature, S.B. 45, S.B. 293 (ch. 2), S.B. 415(ch. 15), S.B. 459, S.B. 529 (ch. 37), S.B. 835 (ch. 6), S.B. 901 (ch. 54), S.B. 903 (ch. 3), S.B. 1749 (ch. 29), and S.B. 1985 (ch. 4).

**Texas Statutes & Codes Annotated by LexisNexis®  >  Constitution of the State of Texas 1876 > Article VIII Taxation**

## Sec. 11. Place of Assessment; Value of Property Not Rendered by Owner.

All property, whether owned by persons or corporations shall be assessed for taxation, and the taxes paid in the county where situated, but the Legislature may, by a two-thirds vote, authorize the payment of taxes of non-residents of counties to be made at the office of the Comptroller of Public Accounts. And all lands and other property not rendered for taxation by the owner thereof shall be assessed at its fair value by the proper officer.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2015 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.

# Tex. Tax Code § 1.04

This document is current through the 2015 regular session, 84th Legislature, S.B. 45, S.B. 293 (ch. 2), S.B. 415(ch. 15), S.B. 459, S.B. 529 (ch. 37), S.B. 835 (ch. 6), S.B. 901 (ch. 54), S.B. 903 (ch. 3), S.B. 1749 (ch. 29), and S.B. 1985 (ch. 4).

**Texas Statutes & Codes Annotated by LexisNexis®  >  Tax Code  >  Title 1 Property Tax Code  >  Subtitle A General Provisions  >  Chapter 1 General Provisions**

## Sec. 1.04. Definitions.

In this title:

(1) "Property" means any matter or thing capable of private ownership.

(2) "Real property" means:

(A) land;

(B) an improvement;

(C) a mine or quarry;

(D) a mineral in place;

(E) standing timber; or

(F) an estate or interest, other than a mortgage or deed of trust creating a lien on property or an interest securing payment or performance of an obligation, in a property enumerated in Paragraphs (A) through (E) of this subdivision.

(3) "Improvement" means:

(A) a building, structure, fixture, or fence erected on or affixed to land;

(B) a transportable structure that is designed to be occupied for residential or business purposes, whether or not it is affixed to land, if the owner of the structure owns the land on which it is located, unless the structure is unoccupied and held for sale or normally is located at a particular place only temporarily; or

(C) for purposes of an entity created under Section 52, Article III, or Section 59, Article XVI, Texas Constitution, the:

(i) subdivision of land by plat;

(ii) installation of water, sewer, or drainage lines; or

(iii) paving of undeveloped land.

(3-a) Notwithstanding anything contained herein to the contrary, a manufactured home is an improvement to real property only if the owner of the home has elected to treat the manufactured home as real property pursuant to Section 1201.2055, Occupations Code, and a certified copy of the statement of ownership and location has been filed with the real property records of the county in which the home is located as provided in Section 1201.2055(d), Occupations Code.

(4) "Personal property" means property that is not real property.

**(5)** "Tangible personal property" means personal property that can be seen, weighed, measured, felt, or otherwise perceived by the senses, but does not include a document or other perceptible object that constitutes evidence of a valuable interest, claim, or right and has negligible or no intrinsic value.

**(6)** "Intangible personal property" means a claim, interest (other than an interest in tangible property), right, or other thing that has value but cannot be seen, felt, weighed, measured, or otherwise perceived

by the senses, although its existence may be evidenced by a document. It includes a stock, bond, note or account receivable, franchise, license or permit, demand or time deposit, certificate of deposit, share account, share certificate account, share deposit account, insurance policy, annuity, pension, cause of action, contract, and goodwill.

(7) "Market value" means the price at which a property would transfer for cash or its equivalent under prevailing market conditions if:

(A) exposed for sale in the open market with a reasonable time for the seller to find a purchaser;

(B) both the seller and the purchaser know of all the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions on its use; and

(C) both the seller and purchaser seek to maximize their gains and neither is in a position to take advantage of the exigencies of the other.

(8) "Appraised value" means the value determined as provided by Chapter 23 of this code.

(9) "Assessed value" means, for the purposes of assessment of property for taxation, the amount determined by multiplying the appraised value by the applicable assessment ratio, but, for the purposes of determining the debt limitation imposed by Article III, Section 52, of the Texas Constitution, shall mean the market value of the property recorded by the chief appraiser.

(10) "Taxable value" means the amount determined by deducting from assessed value the amount of any applicable partial exemption.

(11) "Partial exemption" means an exemption of part of the value of taxable property.

(12) "Taxing unit" means a county, an incorporated city or town (including a home-rule city), a school district, a special district or authority (including a junior college district, a hospital district, a district created by or pursuant to the Water Code, a mosquito control district, a fire prevention district, or a noxious weed control district), or any other political unit of this state, whether created by or pursuant to the constitution or a local, special, or general law, that is authorized to impose and is imposing ad valorem taxes on property even if the governing body of another political unit determines the tax rate for the unit or otherwise governs its affairs.

(13) "Tax year" means the calendar year.

(14) "Assessor" means the officer or employee responsible for assessing property taxes as provided by Chapter 26 of this code for a taxing unit by whatever title he is designated.

(15) "Collector" means the officer or employee responsible for collecting property taxes for a taxing unit by whatever title he is designated.

(16) "Possessory interest" means an interest that exists as a result of possession or exclusive use or a right to possession or exclusive use of a property and that is unaccompanied by ownership of a fee simple or life estate in the property. However, "possessory interest" does not include an interest, whether of limited or indeterminate duration, that involves a right to exhaust a portion of a real property.

(17) "Conservation and reclamation district" means a district created under Article III, Section 52, or Article XVI, Section 59, of the Texas Constitution, or under a statute enacted under Article III, Section 52, or Article XVI, Section 59, of the Texas Constitution.

(18) "Clerical error" means an error:

(A) that is or results from a mistake or failure in writing, copying, transcribing, entering or retrieving computer data, computing, or calculating; or

(B) that prevents an appraisal roll or a tax roll from accurately reflecting a finding or determination made by the chief appraiser, the appraisal review board, or the assessor; however, "clerical error"

does not include an error that is or results from a mistake in judgment or reasoning in the making of the finding or determination.

**(19)** "Comptroller" means the Comptroller of Public Accounts of the State of Texas.

## History

Enacted by Acts 1979, 66th Leg., ch. 841 (S.B. 621), § 1, effective January 1, 1982; am. Acts 1981, 67th Leg., 1st C.S., ch. 13 (S.B. 17), § 2, effective January 1, 1982; am. Acts 1987, 70th Leg., ch. 984 (S.B. 1315), § 25, effective June 19, 1987; am. Acts 1989, 71st Leg., ch. 1123 (H.B. 2301), § 1, effective January 1, 1990; am. Acts 1991, 72nd Leg., ch. 20 (S.B. 351), § 13, effective August 26, 1991; am. Acts 1991, 72nd Leg., ch. 393 (S.B. 514), § 1, effective June 10, 1991; am. Acts 1991, 72nd Leg., ch. 843 (S.B. 984), § 6, effective September 1, 1991; am. Acts 1991, 72nd Leg., 1st C.S., ch. 14 (H.B. 169), § 8.01(22), effective November 12, 1991; am. Acts 1993, 73rd Leg., ch. 347 (S.B. 7), § 4.04, effective May 31, 1993; am. Acts 1997, 75th Leg., ch. 1070 (S.B. 1865), § 52, effective September 1, 1997; am. Acts 2005, 79th Leg., ch. 1284 (H.B. 2438), § 30, effective June 18, 2005.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2015 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.

# Tex. Tax Code § 6.02

This document is current through the 2015 regular session, 84th Legislature, S.B. 45, S.B. 293 (ch. 2), S.B. 415(ch. 15), S.B. 459, S.B. 529 (ch. 37), S.B. 835 (ch. 6), S.B. 901 (ch. 54), S.B. 903 (ch. 3), S.B. 1749 (ch. 29), and S.B. 1985 (ch. 4).

**Texas Statutes & Codes Annotated by LexisNexis®** > **Tax Code** > **Title 1 Property Tax Code** > **Subtitle B Property Tax Administration** > **Chapter 6 Local Administration** > **Subchapter A Appraisal Districts**

## Sec. 6.02. District Boundaries.

(a) The appraisal district's boundaries are the same as the county's boundaries.

(b) This section does not preclude the board of directors of two or more adjoining appraisal districts from providing for the operation of a consolidated appraisal district by interlocal contract.

(c) to (g) [Repealed by Acts 2007, 80th Leg., ch. 648 (H.B. 1010), § 5(2), effective January 1, 2008.]

## History

Enacted by Acts 1979, 66th Leg., ch. 841 (S.B. 621), § 1, effective January 1, 1980; am. Acts 1981, 67th Leg., 1st C.S., ch. 13 (H.B. 30), §§ 14, 167(a), effective January 1, 1982; am. Acts 1983, 68th Leg., ch. 117 (S.B. 433), § 1, effective May 17, 1983; am. Acts 1991, 72nd Leg., ch. 20 (S.B. 351), § 14, effective August 26, 1991; am. Acts 1991, 72nd Leg., ch. 391 (H.B. 2885), § 13, effective August 26, 1991; am. Acts 1993, 73rd Leg., ch. 347 (S.B. 7), § 4.05, effective May 31, 1993; am. Acts 1997, 75th Leg., ch. 165 (S.B. 898), § 6.72, effective September 1, 1997; am. Acts 2007, 80th Leg., ch. 648 (H.B. 1010), §§ 1, 5(2), effective January 1, 2008.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2015 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.

# Tex. Tax Code § 21.01

This document is current through the 2015 regular session, 84th Legislature, S.B. 45, S.B. 293 (ch. 2), S.B. 415(ch. 15), S.B. 459, S.B. 529 (ch. 37), S.B. 835 (ch. 6), S.B. 901 (ch. 54), S.B. 903 (ch. 3), S.B. 1749 (ch. 29), and S.B. 1985 (ch. 4).

**Texas Statutes & Codes Annotated by LexisNexis®  > Tax Code  > Title 1 Property Tax Code  > Subtitle D Appraisal and Assessment  > Chapter 21 Taxable Situs**

## Sec. 21.01. Real Property.

Real property is taxable by a taxing unit if located in the unit on January 1, except as provided by Chapter 41, Education Code.

## History

Enacted by Acts 1979, 66th Leg., ch. 841 (S.B. 621), §  1, effective January 1, 1982; am. Acts 1993, 73rd Leg., ch. 347 (S.B. 7), §  4.10, effective May 31, 1993; am. Acts 1997, 75th Leg., ch. 165 (S.B. 898), §  6.74, effective September 1, 1997.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2015 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.